VILAS et ux. v. ALGAR et al.

(Circuit Court of Appeals, Ninth Circuit. May 17, 1901.)

No. 657.

1. PUBLIC LANDS—ENTRY WITHIN LIMITS OF TOWN SITE—CONSTRUCTION OF STATUTE.

In Act March 3, 1877 (19 Stat. 392, § 2), which confirms entries which had been theretofore "allowed upon lands afterward ascertained to have been embraced in the corporate limits of any town," which entries are regular, and are shown to include only vacant, unoccupied lands, not settled upon or used for municipal purposes, provided such confirmation shall not operate to restrict the entry of the town site to less than the maximum area permitted by law, the words "afterward ascertained" refer to the land department, and not to the settler; and the act applies to and confirms an entry in all respects within its terms, and upon which final proof had been made and accepted at a time when there was nothing upon the records of the department to show that the land was embraced within a town site, notwithstanding the settler may have known when he made the entry that it was claimed as within the town site, since such fact does not necessarily impeach his good faith, and it is the express purpose of the act to subject to entry all unoccupied land so claimed, above the maximum quantity therein prescribed.

2. SAME.

Such act confirms only entries which at the time of its passage had been "allowed," and does not apply to an entry which, while it had been allowed, and final proof accepted by the local land office, had subsequently, and prior to the passage of the act, been held for cancellation by the commissioner of the general land office. Per Ross, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern Division of the District of Washington.

On June 26, 1874, Frederick A. Minnick filed his declaratory statement with the register and receiver of the United States land office that he had settled upon and intended to enter the land which is in controversy in this suit, under the United States pre-emption law. On May 4, 1875, he made final proof of his residence and his improvements, agreeably to the rules and regulations of the land department, and to the satisfaction of the register and receiver, whereupon his entry was allowed, and he paid the statutory price for the land, and was given the usual receiver's receipt therefor, and a duplicate patent certificate. Subsequently he conveyed the land to Henry S. Algar, now deceased, under whom the appellees in the present suit claim title. Thereafter a contest was instituted by the city of Seattle against Frederick A. Minnick, before the commissioner of the general land office, for the purpose of canceling the said entry of Minnick, and securing the allowance of an entry by the city under the town-site laws of the United States. Testimony was taken and a hearing was had before the commissioner, and on January 12, 1877, he ruled against the application of the city of Seattle, and denied its right to make entry of the land. But at the same time, and upon the ground that the land was at and before the date of Minnick's entry included within the corporate limits of the city of Seattle, he held the entry of Minnick for cancellation. Both parties appealed from his decision to the secretary of the interior, and the appeal was heard on March 19, 1879. The attention of the secretary was directed to the act of congress approved March 3, 1877, which it was contended made valid the entry of Minnick. The secretary of the interior, however, sustained the decision of the commissioner of the general land office, upon the ground that it was not the intention of congress by that act to confirm entries made by persons who knew at the time of making entry that the land included therein was embraced within the corporate limits of any town. In his decision the secretary said: "The

testimony in this case shows that during most of the period of Minnick's alleged residence on the land he was the marshal of the city of Seattle; that he voted in the city election of 1874, and exercised all the rights and privileges claimed and exercised by other citizens of the city. His authority as marshal was confined to the corporate limits of the city, and it was impossible for him not to have known, as a matter of fact, that the land claimed by him was within the city limits." In pursuance of that decision, on April 3, 1879, the entry of Minnick was canceled. W. C. Hill and J. Vance Lewis thereafter located the land with Porterfield scrip, and on January 9, 1882, patent was issued to them by the United States. Lewis subsequently conveyed to Hill. On August 21, 1887, Hill executed and delivered to Alfred S. Moore and others an instrument in writing reciting that Alfred S. Moore and others were about to construct a cable road in Seattle, which would be of benefit to Hill's property, and that for the purpose of aiding the construction of such road, and in consideration of one dollar, Hill had bound himself to convey to Moore and his associates the premises which are here in controversy, conditioned upon the completion of the cable road by October 1, 1888. The instrument recited that Moore and his associates upon their part did agree to build and equip the said cable road on or before that date. The instrument was signed and sealed by W. C. Hill only. Eight months thereafter, on April 21, 1888, Henry S. Algar began a suit in the territorial court of King county, Wash., against Hill and Lewis, for the purpose of establishing his equitable title to said land as against them. His contention was sustained, and on appeal to the supreme court of the state his title was affirmed. Alger v. Hill, 2 Wash. St. 344, 27 Pac. 922; Id., 6 Wash. 358, 33 Pac. 872. In pursuance of the decree so rendered, a conveyance was made by a commissioner appointed by the court, transferring to Algar all the right, title, and interest, both legal and equitable, owned by said Hill and Lewis at the date of the commencement of the suit. In the meantime Moore and his associates had constructed the cable road as required in their agreement, and on March 13, 1888, they executed a quitclaim deed of their interest in the land to the Seattle Land & Improvement Company, which corporation subsequently transferred its interest by mesne conveyance unto the appellants, who, as complainants in the court below, brought the present suit against the appellees, alleging that the latter held the legal title acquired by the patent from the United States in trust for the complainants, and praying the court to decree the latter to be the equitable owners of the land in controversy. The court ruled adversely to this contention, and dismissed the bill.

R. C. Strudwick, W. A. Peters, and Geo. McKay, for appellants.

E. C. Hughes, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The appellants contend that the instrument executed and delivered by W. C. Hill to A. S. Moore and his associates conveyed to the latter an equitable interest in the land, which was not affected by the judgment which was rendered for the plaintiff in the suit of Alger v. Hill and others, and that the circuit court erred in ruling that Minnick, by virtue of his pre-emption entry and settlement upon the land in controversy, acquired an equitable title thereto superior to the rights of the appellants. The statute of March 3, 1877 (19 Stat. 392), entitled "An act respecting the limits of reservations for townsites upon the public domain," provided in section 1—

"That the existence or incorporation of any town upon the public lands of the United States shall not be held to exclude from pre-emption or homestead entry a greater quantity than twenty-five hundred and sixty acres of

land, * * * unless the entire tract claimed or incorporated as such town-site shall, including and in excess of the area above specified, be actually settled upon, inhabited, improved, and used for business and municipal purposes."

Provision was made in section 3 authorizing the commissioner of the general land office to require the authorities of any town on the public domain whose corporate limits included lands in excess of the maximum area specified in section 1 to elect what portion should be withheld from pre-emption and homestead entry, and declared that thereafter the residue of such lands should be open to disposal under the homestead and pre-emption laws. Section 2 contains the provisions which we are called upon to construe in the present case. It provides as follows:

"That where entries have been heretofore allowed upon lands afterwards ascertained to have been embraced in the corporate limits of any town, but which entries are or shall be shown, to the satisfaction of the commissioner of the general land office, to include only vacant unoccupied lands of the United States, not settled upon or used for municipal purposes, nor devoted to any public use of such town, said entries, if regular in all respects, are hereby confirmed and may be carried into patent."

The act was intended to apply to and remedy a state of facts that existed in many Western towns, where the corporate limits included large tracts of public land, unoccupied and unimproved, and not used for business or municipal purposes. It was evidently the purpose of the act to establish a limitation upon such reservations for town sites on the public domain, and to open to settlement under the public land laws the unoccupied lands that were not used or required for municipal purposes. It is stipulated in the present case that at the time when Frederick A. Minnick filed his declaratory statement the land in controversy was public land of the United States, and was not settled upon or used for any municipal purpose, or devoted to any public use of any town or city, and was not actually settled upon or occupied for the purpose of trade or business, and that there was no map or plat in the office of the register and receiver showing the corporate limits of the city of Seattle, and the said limits did not appear at that time upon any of the official township plats prepared by the surveyor general of the territory, and on file in the office of the register and receiver. There can be no doubt that the entry made by Minnick was one which had been theretofore "allowed," as that term is used in section 2 of the statute. At the time when the statute was enacted Minnick's entry had been made, his proofs of settlement and improvement had been presented to the satisfaction of the register and receiver, and he had paid the statutory pre-emption price for the land, which fact had been evidenced by the issuance of the receiver's receipt and patent certificate. Evidently it was to such a state of facts that congress intended to apply the words "where entries have been heretofore allowed."

But it is contended that Minnick's entry is excluded from the operation of the act of 1877 for the reason that it cannot be said to be an entry which, in the language of the statute, was "afterwards ascertained" to have been embraced within the corporate limits of the town. It is said that the record of proceedings in the land

office shows that, at the time of making his entry and presenting his proofs, Minnick was aware that the land was within the corporate limits of the city of Seattle, and that he knew it to be land which by law was withheld from pre-emption or homestead entry. It is true that the secretary of the interior ruled in accordance with this contention. His conclusion that Minnick knew the land in controversy to be within the corporate limits of the town was based not upon any direct proof to that effect, but was deduced by a course of reasoning from the fact that Minnick was the marshal of the town and had voted at a city election in 1874. We discover nothing in the language of the act, or in the purpose intended thereby to be accomplished, or the circumstances under which it was enacted, to indicate that the relief which was thereby proposed to be afforded was intended to be limited to settlers who had made pre-emption or homestead entries in ignorance of the fact that the lands covered by their entries were within corporate limits. The statute was evidently intended for the guidance of the officers of the land department. It contained directions for their action in a case such as that which is here presented. That public lands should lie within the limits of an incorporated town unoccupied by the city for municipal purposes, impossible of entry under the town-site act, and at the same time excluded from entry under the public land laws by individual settlers, was evidently regarded as undesirable. We discover nothing in the record, however, which impugns the good faith of Minnick's entry. A man who was marshal of a town for one year, and who voted at a city election, might still be ignorant of the corporate limits of a city which included within its boundaries unimproved, unoccupied agricultural or timber lands, or he might have believed, as it appears that others believed, that the act of incorporation of 1869 was invalid, or he might have been ignorant of the law which excluded from entry lands within the boundaries of an incorporated town. Such a settler as Minnick, by pursuing the remedies afforded by section 3 of the act, and requiring the commissioner of the general land office to follow the course therein prescribed, might undoubtedly thereafter have made a valid entry under the pre-emption law upon the land in question. In such a case his knowledge or want of knowledge that the land was within the corporate limits of the town could have no relation to his right to make such entry. Congress evidently did not intend to discriminate between the rights of entrymen whose entries had been theretofore allowed and those who might afterwards make entry under the provision of section 3. The entry which Minnick made was allowed in the office of the register and receiver, manifestly, for want of information in that office concerning the corporate limits of the city. His proofs of settlement and improvements and his purchase money were received in like ignorance on that subject. It was not until afterwards that it was "ascertained" in that office that the land was within the corporate limits. It was an entry which, so far as the record shows, was regular in all respects. By section 2 of the statute it was confirmed and was authorized to be carried into patent. Alger v. Hill, 2 Wash. St. 344, 27 Pac. 922; Id., 6 Wash. 358, 33 Pac. 872. Entertain-

ing this view of the rights which Minnick acquired under the statute, we find it unnecessary to consider the other question which is presented on the appeal. The decree of the circuit court is affirmed.

ROSS, Circuit Judge (dissenting). Sections 1 and 2 of the act of congress of March 3, 1877, are as follows:

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that the existence or incorporation of any town upon the public lands of the United States shall not be held to exclude from pre-emption or homestead entry a greater quantity than twenty-five hundred and sixty acres of land, or the maximum area which may be entered as a town-site under existing laws, unless the entire tract claimed or incorporated as such town-site shall, including and in excess of the area above specified, be actually settled upon, inhabited, improved, and used for business and municipal purposes.

"Sec. 2. That where entries have been heretofore allowed upon lands afterwards ascertained to have been embraced in the corporate limits of any town, but which entries are or shall be shown, to the satisfaction of the commissioner of the general land office, to include only vacant unoccupied lands of the United States, not settled upon or used for municipal purposes, nor devoted to any public use of such town, said entries, if regular in all respects, are hereby confirmed and may be carried into patent: provided, that this confirmation shall not operate to restrict the entry of any town-site to a smaller area than the maximum quantity of land which, by reason of present population, it may be entitled to enter under section twenty-three hundred and eighty-nine of the Revised Statutes." 19 Stat. 392.

Although Minnick's entry was allowed by the register and receiver of the local land office, their action was afterwards annulled by the commissioner of the general land office, and at the time of the passage of the act of March 3, 1877, the entry stood disallowed and canceled of record. I am unable to understand how such an entry can be held to meet the first requirement of section 2 of the curative act. The act does not purport to cure any entry theretofore and at the time of its passage disallowed, which was the status of Minnick's entry. In my opinion, there must, of necessity, be a live, subsisting entry for the act to operate upon, the defects of which, pointed out in the statute, are thereby cured. But, without a subsisting entry, there is nothing calling for the application of the statute in question. I therefore respectfully dissent.